21-193(L)
*United States v. Suarez*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 28th day of April, two thousand twenty-three.

PRESENT:

> BARRINGTON D. PARKER,
> RICHARD J. SULLIVAN,
> *Circuit Judges,*
> JOHN L. SINATRA, JR.,
> *District Judge.*[*]

_____

UNITED STATES OF AMERICA,

> *Appellee,*

v.                                                                          No. 21-193(L)

JOSE SUAREZ, AKA CHOMPIRA,

> *Defendant-Appellant.*[†]

_____

---

[*] John L. Sinatra, Jr., of the United States District Court for the Western District of New York, sitting by designation.

[†] The Clerk of Court is respectfully directed to amend the official case caption as set forth above.

**For Defendant-Appellant:**         JEREMIAH DONOVAN, Old Saybrook, CT.

**For Appellee:**         NINA C. GUPTA (David C. James, *on the brief*), Assistant United States Attorneys, *for* Breon Peace, United States Attorney for the Eastern District of New York, Brooklyn, NY.

Appeal from a judgment of the United States District Court for the Eastern District of New York (Joseph F. Bianco, *Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

Jose Suarez appeals from his judgment of conviction following a jury trial in which he was found guilty on nine counts, including conspiracy to commit assault resulting in serious bodily injury in aid of racketeering (Count One), assault resulting in serious bodily injury in aid of racketeering (Count Two), conspiracy to commit murder in aid of racketeering (Count Three), murder in aid of racketeering (Count Four), and assault with a dangerous weapon in aid of racketeering (Count Seven), all in violation of 18 U.S.C. § 1959 (collectively, the "VICAR Convictions"); two counts of brandishing and discharging a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c) (Counts Five and

2

Eight); causing the death of another through the use of a firearm, in violation of 18 U.S.C. § 924(j)(1) (Count Six); and being an accessory after the fact to the crimes charged in Counts Three through Eight, in violation of 18 U.S.C. § 3 (Count Nine). The district court sentenced Suarez to a mandatory life sentence on Count Four for murder in aid of racketeering; consecutive ten-year sentences on Counts Five, Six, and Eight for the firearms offenses; and concurrent sentences for the remaining counts. On appeal, Suarez raises four principal challenges to his conviction and sentence, each of which we address in turn. We assume the parties' familiarity with the underlying facts, procedural history, and issues on appeal.

## I. Sufficiency of the Evidence

Suarez first challenges the sufficiency of the evidence underlying each of his VICAR Convictions. Specifically, he argues that the evidence produced at trial was not sufficient to show that he committed those offenses for the purpose of "gaining entrance to or maintaining or increasing [his] position in an enterprise engaged in racketeering activity" – here, MS-13. 18 U.S.C. § 1959(a). While we review sufficiency of the evidence claims de novo, a "defendant seeking to overturn a jury verdict on sufficiency grounds bears a heavy burden," because we will "uphold the conviction if *any* rational trier of fact could have found the

3

essential elements of the crime beyond a reasonable doubt." *United States v. Anderson*, 747 F.3d 51, 59 (2d Cir. 2014) (internal quotation marks omitted). When considering a sufficiency challenge, we view the evidence "in its totality, not in isolation," *United States v. Huezo*, 546 F.3d 174, 178 (2d Cir. 2008) (internal quotation marks omitted), and "in a light that is most favorable to the government, . . . with all reasonable inferences resolved in favor of the government," *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011) (internal quotation marks omitted).

Here, there was more than sufficient evidence for the jury to conclude that the animating purpose of Suarez's conduct was to maintain or increase his position in the so-called "Sailors clique" of MS-13. At trial, a former MS-13 gang member, Kevin Cifuentes, testified that he and Suarez were "associates" in MS-13. App'x at 154, 161. His testimony, which was corroborated by telephone records, cell-site data, and a drug ledger seized by the FBI, established that Suarez sold drugs on behalf of the Sailors, stored the gang's car at his home, participated in a gang-related assault at Super Taco, and helped execute the murder of a rival gang member – all conduct that someone of Suarez's rank was expected to perform. *See United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992) (holding that section

4

1959's motive requirement may be satisfied where, as here, the defendant committed the violent crimes at issue because "he knew [such conduct] was expected of him by reason of his membership in the enterprise"). Moreover, the car storage, assault, and murder occurred after Cifuentes told Suarez that he would have to stop "hanging out" with MS-13 members unless he got "involved" in violence at the next opportunity. App'x at 178–79. While Suarez insists that he merely "associated" with MS-13 gang members and was not in fact an "associate" in the gang, Suarez Br. at 34–35, the jury was certainly free to credit the government's evidence to the contrary. Because we must "defer to the jury's assessment of witness credibility and the jury's resolution of conflicting testimony," we have no basis for disturbing the jury's verdict on appeal. *United States v. Triumph Cap. Grp., Inc.*, 544 F.3d 149, 159 (2d Cir. 2008) (internal quotation marks omitted).

## II. Peremptory Challenges

Suarez next argues that the government impermissibly used its peremptory challenges to strike three prospective jurors – Jurors 12, 77, and 222 – based on their race or ethnicity. In evaluating an equal-protection challenge to a prosecutor's use of peremptory strikes, we employ the three-part framework

5

under *Batson v. Kentucky*, 476 U.S. 79, 96–98 (1986). First, the defendant must make a prima facie showing that the prosecutor made a peremptory challenge based on a protected characteristic. *Id.* at 96–97. If the defendant fulfills this requirement, the burden shifts to the prosecutor to give a race-neutral explanation for the strike. *Id.* at 97–98. The court must then examine the justification and determine whether the defendant has carried the ultimate burden of proving that the strike constituted purposeful discrimination. *Id.* at 98. The district court's evaluation of whether a proffered explanation is pretextual is entitled to "great deference" and reviewed only for clear error. *See Hernandez v. New York*, 500 U.S. 352, 364 (1991).

For starters, we agree with the district court that Suarez has failed to make a prima facie showing under *Batson*. *See* App'x at 144 ("I don't believe any type of showing has been made to satisfy the *Baston* requirements."). We have held that a prima facie case under *Batson* can be based on "exclusion rates," meaning by demonstrating that the prosecutor used his or her peremptory challenges to strike "a disproportionate number of members of a cognizable racial group from the venire." *Jones v. West*, 555 F.3d 90, 98 (2d Cir. 2009). If the asserted prima facie case is based on exclusion rates, the defendant must make an adequate record

of "how many members of that group were in the venire, and how many of those were struck." *Id.* at 99 (collecting cases). We have also observed that "[c]ases involving successful challenges to exclusion rates have typically included patterns in which members of the racial group are *completely* or *almost completely* excluded from participating on the jury." *Id.* at 98 (emphasis added) (collecting cases).

Here, Suarez argues that the prosecutor violated his constitutional rights by improperly striking "all the Hispanics" from the jury. App'x at 144–45. But as the district court noted, Suarez did not make an adequate record of "how many [Hispanics] were in the venire, and how many of [them] were struck." *Jones*, 555 F.3d at 99; *see also* App'x at 147 ("[T]he idea that there are no Hispanic jurors on this case is something that I don't think we can take to be a given."). Instead, defense counsel conceded during jury selection that there were at least two minority jurors on the panel who "could be Afro-Hispanic or Afro-Caribbean," and "four or five" additional jurors who could speak Spanish and "might have been" Hispanic. App'x at 144; *see id.* at 147 ("The Court: So why do you think the other jurors are not Hispanic? [Defense Counsel]: We don't know if they are Hispanic. They might have been."). On this record, we simply cannot conclude

7

that Suarez has made the threshold showing of "purposeful discrimination in [the government's] selection of the petit jury."  *Batson*, 476 U.S. at 96.

Even if Suarez could satisfy his burden under the first step of *Batson*, the district court still correctly concluded that the prosecutor "in each of the instances articulated race[-]neutral reasons" justifying the disputed challenges.  App'x at 144.  During voir dire, the prosecutor explained that he struck Juror No. 12 because "there was[n't] any information filled out" about him, and consequently, he didn't know much about the Juror.  *Id.* at 136.  What he did know – that Juror No. 12 was unemployed and that his wife "was on disability" – suggested to the prosecutor that the Juror might struggle to "interact with the other jurors," as both he and his wife were "a little outside the normal functioning of a society."  *Id.*  As to Juror No. 77, the prosecutor stated that the Juror's cousin had been convicted of murder, she had a degree in child psychology, and she worked for the New York State Division of Parole.  The prosecutor specifically explained that the Juror's employment gave him "concern . . . that [she was] going to base [her] decision on something having to do with [her] job," which was "outside the knowledge or control of the prosecution."  *Id.* at 140.  And with respect to Juror No. 222, the prosecutor was concerned about potential bias because the Juror was employed at

8

a juvenile facility, and "the evidence in this case" included "numerous violent acts by a number of very young individuals[,] . . . many of whom may or may not have spent time in a juvenile facility and . . . interact[ed] with . . . people" like the Juror. *Id.* at 138. The prosecutor also explained that Juror No. 222 had been a victim of domestic violence, which he feared would cause her to discount the testimony of one of the government's potential trial witnesses who had previously engaged in domestic violence. Because Suarez has not shown that any of these explanations were pretextual – such as through evidence of the government's "shifting explanations, . . . misrepresentations of the record, and [a] persistent focus on race" – we cannot conclude that the district court erred in denying Suarez's *Batson* challenges. *Foster v. Chatman*, 578 U.S. 488, 512 (2016); *see also Purkett v. Elem*, 514 U.S. 765, 768–69 (1995) (noting that *Batson* requires "not a reason that makes sense, but a reason that does not deny equal protection," even if the reason is "silly or superstitious").

## III. Motion to Withdraw as Counsel

Suarez next argues that the district court violated his Sixth Amendment right to counsel by failing, post-verdict, to grant the motion of his lawyer, John Carman, to withdraw and appoint a fourth attorney to represent him. While the

Sixth Amendment "guarantees defendants in criminal cases the right to adequate representation," it does not give "impecunious defendants . . . a Sixth Amendment right to choose their counsel." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989). Because Suarez does not argue that the district court's denial of the motion to withdraw resulted in the "actual or constructive denial of the assistance of counsel altogether," *Lainfiesta v. Artuz*, 253 F.3d 151, 157 (2d Cir. 2001) (internal quotation marks and alterations omitted), we review that decision only for abuse of discretion, *see United States v. Oberoi*, 331 F.3d 44, 47 (2d Cir. 2003).

Here, the district court did not abuse its discretion by denying Carman's motion to withdraw from the case. Prior to sentencing, Carman moved to withdraw at Suarez's request after he advised Suarez that "there were no non-frivolous [post-trial] motions to be filed" and no "promising issue[s] to be raised on appeal." App'x at 105. But Suarez is unable to point to any prejudice that resulted from the district court's decision to deny that request. *See United States v. Griffiths*, 750 F.3d 237, 239, 242 (2d Cir. 2014) (holding "that there is no per se violation of the Sixth Amendment right to be represented by one's counsel of choice," and that the defendant must show "particularized prejudice" as a result of the alleged denial of that right). He contends only that it is "difficult to

10

contemplate a federal murder case" in which the defendant did not file a motion for judgment of acquittal, a motion for a new trial, or a sentencing submission. Suarez Br. at 52. But Suarez fails to identify any potentially *meritorious* arguments that counsel should have raised before the district court. While Suarez hypothesizes that trial counsel might have raised below the very arguments he now presses on appeal, those arguments, for the reasons explained in this order, are not meritorious and would not have changed the outcome of the district-court proceedings.

Moreover, the district court denied the motion only after holding a conference with Suarez and Carman at which the court concluded that Carman had "diligently done what he's supposed to do." Gov't App'x at 29. The district court observed that nearly a year and a half had passed since the trial and determined that it was not in Suarez's interest "to just continue adjourning the sentencing," *id.*, a tactic that would only further delay his ability to file an appeal. *See Brumer*, 528 F.3d at 160 ("Judges must be vigilant that requests for appointment of a new attorney . . . should not become a vehicle for achieving delay." (internal quotation marks omitted)). While the court denied the motion, it ruled that Suarez would be permitted to obtain new counsel on appeal, offering Suarez yet

11

another attorney's perspective on his case.   On this record, that decision was not an abuse of discretion.[3]

## IV.   Sentencing

Suarez contends that his mandatory life sentence for murder in aid of racketeering when he was twenty-two violates the Eighth Amendment's prohibition against "cruel and unusual" punishment because he was merely an accessory to the murder and did not actually kill anyone himself.[4]   But we have already rejected this argument in light of the Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460 (2012), which held that juvenile offenders (i.e., individuals under eighteen years old), but not adult offenders (i.e., individuals over eighteen years old), are protected from mandatory life-without-parole sentences.   *See*

---

[3] Nor are we persuaded that the district court erred in not sua sponte directing Carman to file a brief pursuant to *Anders v. California*, 386 U.S. 738 (1967).   In *Anders*, the Supreme Court held that appointed counsel may seek to withdraw from a wholly frivolous criminal appeal only if the motion to withdraw is accompanied by "a brief referring to anything in the record that might arguably support the appeal."   386 U.S. at 744.   But there is no requirement that such a brief must be filed every time counsel, *at the request of his client*, files a motion to withdraw *in the district court*.   *See Pennsylvania v. Finley*, 481 U.S. 551, 554–55 (1987) ("*Anders* did not set down an independent constitutional command that all lawyers, in all proceedings, must follow these particular procedures.").   We therefore cannot conclude that the district court abused its discretion by denying Carman's motion to withdraw without requiring him to first file an *Anders* brief.

[4] While Suarez also argues that his sentence violates the principle of separation of powers, this aspect of his challenge is unaccompanied by any explanation or argument and is therefore forfeited.   *See United States v. Graham*, 51 F.4th 67, 79–80 (2d Cir. 2022); *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001).

*United States v. Sierra*, 933 F.3d 95, 97–99 (2d Cir. 2019). Suarez concedes *Sierra*'s controlling force but has nevertheless raised this issue on appeal to preserve it "for some future day." Suarez Br. at 57. Whatever the future may hold, the law today is clear that Suarez's life sentence does not violate the Eighth Amendment's ban on "cruel and unusual" punishment.

\*    \*    \*

We have considered Suarez's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

13